## MINERS' BANK OF DUBUQUE v. UNITED STATES

A bank, in which the stock is owned by individuals, is a private corporation. Grants and franchises are to be construed in favor of the state.

Upon a proper showing, a judicial tribunal may vacate the charter of a bank for misuse or abuse, when the legislature does not reserve that power; but if the legislature reserve to themselves the power to repeal a charter or act of incorporation upon a misuse or abuse of corporate powers, they may do so without the interposition of a judicial tribunal: they are the proper judges of such misuse or abuse; and their acts, their motives, or the sufficiency of evidence before them, cannot be collaterally questioned. It is not the province of the judiciary to determine whether a law is, or is not enacted expediently, or under proper contingencies and motives, and thereupon decide as to its validity. It is their province to place upon them a legitimate construction, and enforce them so far as they are adjudged constitutional.

### ERROR, *to Dubuque District Court.*

This was an information in the nature of a *quo warranto* filed by the United States, on the relation of the prosecuting attorney, against the president, directors and company of the Miners' Bank of Dubuque. The bank pleaded the act of incorporation. The prosecuting attorney then filed a replication, setting up the statute of 1845, repealing the char-

ter of said bank. To this replication the bank rejoined, that the repealing law was enacted without a failure of the bank to go into operation, and without its having misused or abused its privileges. A general demurrer was filed to the rejoinder, which was sustained by the court, and judgment rendered accordingly against the bank.

*T. Davis* and *P. Smith,* for the bank. The following argument was submitted in writing by Mr. Smith. As the pleadings now stand, the only question that addresses itself to the consideration of the court is, whether the legislature had the right to repeal the charter, without the bank having first failed to go into operation, or having abused or misused its privileges. The demurrer admits the fact stated in the rejoinder, which admission establishes the fact that the contingency contained in the reservation of the charter had not happened at the time of the supposed repeal. The case then presents the naked question, whether the legislature can repeal a bank charter without any default or misconduct on the part of the bank. And in the discussion of this point is involved a grave constitutional question. We contend that the repealing act is void, on the ground of repugnancy to the constitution of the United States and the ordinance of 1787. And in evolving this question, it is but natural for this court to turn its eyes upon the decisions of the supreme court of the United States, as the highest and most authoritative known to our Union. Indeed it has been repeatedly decided that the decisions of this learned and distinguished court, with regard to all constitutional questions, are final and conclusive. *Mich. State Bank* v. *Hastings,* 1 Douglass, Mich. R. 235.

1. We take the ground that the grant of a bank charter is a *contract,* and that it is a *private* contract executed.

2. That the *franchise,* as a *franchise,* is *property ;* a vested right which, when granted, cannot be rescinded by the grantor, without the default of the grantee.

And as to the first proposition, that a bank charter is a

*private contract.* In the case of the *Providence Bank* v. *Billings*, 4 Peters R. 560, C. Justice Marshall says, "It has been settled that a contract entered into between a state and an individual, is as fully protected by the tenth section of the first article of the constitution, as a contract between two individuals; and it is not denied that a charter incorporating a bank is a contract." And in the same opinion, he repeatedly calls it a "*private contract.*" And again, in the case of *Dartmouth College* v. *Woodward*, 4 Wheaton, 518, the same learned judge, in delivering the opinion of the court, says, "It can require no argument to prove that the circumstances of this case constitute a contract." And after the fullest discussion of the particular point, as to whether the charter of a college was a *public* or a *private* contract, pronounced it to be a *private contract*, which could not be impaired without violating the constitution of the United States.

Justice Washington, in the same case, repeatedly calls the charter a contract; he too says it is a private, instead of a public contract. He says, "It has been insisted that it was a public, instead of a private corporation; but the authorities are all the other way."

Justice Story, in the same case, says, "Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public politic purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and object of the institution. For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is, in the strictest sense, a public corporation. So a hospital created and endowed by the government

for general charity. But a bank, whose stock is owned by private persons, is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal bridge, and turnpike companies. In all these cases, the uses may, in a certain sense, be called public, but the corporations are private, as much so, indeed, as if the franchises were vested in a single person." And again, he says, " The fact, then, that the charity is public, affords no proof that the corporation is also public; and, consequently, the argument, so far as it is built on this foundation, falls to the ground. If, indeed, the argument were correct, it would follow, that almost every hospital and college would be a public corporation, a doctrine utterly irreconcilable with the whole current of decisions since the time of Lord Coke." Case of Sutton's Hospital, 10 Co. 23.

The supreme court of Ohio calls a bank charter a *private contract.* Case of quo warranto, *State* v. *Granville Alexandrine Society*, 11 Ohio, R. 15; ib. in Illinois, 1 Gilman, R. 672; ib. and in Michigan, 1 Douglass, R. 234; 2 Kent Com. 306; 6 Cranch, 88; 7 ib. 164; 9 ib. 43, 292: and this doctrine is also fully sustained in New York, N. Y. Dig. vol. i. 457; and in Mass. Minot's Dig. 164; and in all the states of the Union. Vid. Angell and Ames on Corporations, 8, 21, 22; Amer. Com. Law, 3 vol. 441, and authorities there cited. We deem that perhaps these decisions may suffice on this point, until at least a single decision may be found to the contrary.

Having disposed of the first point, we will now proceed to consider the second, viz.: Whether a bank charter, a mere franchise, as a franchise, is property. And here we take occasion to say, that Chancellor Kent has classed franchises under the general head of real estate. He says, that " an estate in a franchise, and an estate in land, rests upon the same principles." 3 Kent, Com. 458. And Justice Wayne, in delivering the opinion of the S. C. of U. S., in the case of *Gorden* v. *Appeal Tax Courts*, 3 Howard, 150, says, " The

franchise is their corporate *property*." And again, on the same page, " The capital stock is another property, corporately associated for the purpose of banking, but in its parts is the individual property of the stockholders, in the proportion they may own them." By this it is evident that the court in this case considered the franchise as a distinct property from stock.

And again ; the same judge, in pursuing the distinction, says, " This is not only the case in Maryland, but a franchise for banking is in every State of the Union recognized as property." " The banking capital is another property."

Justice Story, 4 Cond. R. U. S. 576, says, " I am unable to distinguish between the case of a grant of land or of franchise." Again, in the same case, page 580, he says, " In respect to corporate franchise, they are, properly speaking, legal estates, vested in the corporation itself as soon as it is in esse." And again, in the same case, speaking of the right of the legislature to resume the grant of a franchise, he says, " This question cannot be answered in the affirmative, until it is established that the legislature may take the property of A. and give it to B ; and if it cannot take away or restrain corporate *funds*, upon what pretence can it take away or restrain the corporate *franchise ?*"

We trust that the above authorities are sufficient to establish, to the satisfaction of the court, that a franchise is property ; and we will now proceed to discuss the question, whether the legislature can revoke a grant, executed where the grantee has entered into and possessed the property granted for years, without any default on his part. And here, to illustrate the principle, let us suppose a case : The legislature makes a grant of land or other property to A., with a reservation of right to resume the grant, provided that A shall at any time thereafter commit treason or any other offence ; and suppose under this grant that A. should enter into possession of, and enjoy the granted premises for several years, the sovereign power in the meantime (as in the case now at bar) repeatedly passing acts recognizing the grant.

but after all this, suddenly and without notice, the legislature should pass an act rescinding the grant, and seizing the land or franchise granted into its own hands—would this be *prima facie* a constitutional act? or would it be *ipso facto* void? Reason and common sense answer, most certainly it would be void. And yet there is no perceivable distinction between such a case and the case at bar.

But we are told by the prosecuting attorney, that the mere fact of resuming the grant, furnishes evidence that the contingency, giving the right to resume, had happened. Is this correct? If so, what kind of evidence is it? Is it *prima facie?* or is it conclusive? Let us apply the principle to the case just put. Would the mere fact of the passage of an act, that did not upon its face purport to be based upon the fact, that the contingency had happened, be conclusive evidence that A. had been guilty of treason? Or would he be permitted to contest that fact before a court, and deny that he had been guilty, as we now do in the present case?

Let us suppose a stronger case. Suppose the legislature should pass a law as follows: " Whereas, a just compensation has been made to A. for his farm," and should go on and appropriate the same to public use, would the preamble to such an act estop A. from contesting the fact that he had received no compensation for his property? If so, the validity of any such act can never be questioned in the courts.

And it would be raising a presumption of purity and infallibility in favor of legislative acts, of very modern growth. The framers of the constitution did at least suspect that in some instances the legislatures of the states might transcend their authority. And so did the framers of the ordinance of 1787; whence the restrictions found in these instruments. And experience has abundantly confirmed the wisdom of their foresight. 2 Cond. Rep. U. S. 322. C. J. Marshall says: " Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed with some apprehension, the violent acts which might grow out of the feelings of the moment; and

that the people of the U. S., in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions found in this instrument on the legislative power of the states, are obviously founded in this sentiment, and the constitution contains what may be termed a bill of rights for the people of each state." And under this bill of rights contained in the ordinance as well as the constitution, we claim the right to a judicial investigation, which shall fully sift and try the validity of the groundwork, upon which the legislative act in question is based. To use the phrase of C. J. Marshall, could this bill of rights be called a shield for the protection of property, if we indulge in such presumptions as have been contended for ? A lawyer must be hard run for an argument, who resorts to such a subterfuge as this: it will afford but a flimsy shield to protect an unconstitutional act from the eye of a discriminating court.

We are told that we might as well go behind an act of the legislature to inquire whether it was passed by a competent majority. We admit the proposition. We affirm, whenever an unconstitutional act is sought to be sheltered behind such an act, that the courts never stop at the passage of the act, and presume all behind it to be right. We contend that whenever a law is sought to be impeached on the ground of unconstitutionality, the court will look behind the act. Thus for instance, in New York, the constitution of the state requiring " the assent of two thirds of the members elected to each branch of legislature, to every bill creating, continuing, altering, or renewing, any body politic or corporate ;" and the legislature having passed an act of incorporation, the court say that from the mere fact of the passage of the act, it must be deemed *prima facie* at least to have passed by a majority less than two thirds, and that the certificate of the secretary of state, endorsed upon the bill, pursuant to the *Rev. Stat.* 157, sec. 11, is not evidence that it was passed by a vote of two thirds; at all events, it is not conclusive evidence. *Penely* v. *The Peo-*

*ple*, 4 Hill, 384; *State* v. *McBride*, 4 Mo. R. 303. We presume that the strict construction given in the above case, would apply to those cases only where the validity of the act was directly drawn in question, and where the act was sought to be impeached on the ground of unconstitutionality. But in other cases the statute book containing the law, would afford a sufficient presumption that all the prerequisites necessary to make a valid law, had been complied with. But this would be but the ordinary presumption that official servants have done their duty.

The court will recollect that there is a presumption in law that every person is innocent until he is proved to be guilty. Therefore there is less reason for the court to presume that the bank had violated its charter, than there was in New York that the act was not passed by a two-third majority. In New York, if the court had presumed that, from the mere passage of the bill, and the ordinary certificate of the Secretary of State, it would have been but to presume that a public body did its duty. This the court refused to do.

In the present case presumption must be heaped upon presumption, in order to attain the end contended for by the prosecution. In the first place, we must presume, from the mere fact that the legislature reserved the right of repeal upon condition that the bank violated its charter, that they also by implication reserved the right to adjudicate the question of forfeiture : this is the ordinary business of courts of justice. *A fortiori*, it is a judicial rather than a legislative act. Hence they could not be said to reserve power never possessed. Secondly, that the bank had been guilty of a violation of its charter; and, thirdly, that the legislature had given practical exercise to its reserved judicial powers, and declared the bank guilty.

The supreme court of Ohio says, " That the legislature, having granted powers to a private corporation, cannot, consistently with the constitution, take away those powers, without any default on the part of the corporation, is too

well settled to be questioned by *any who regard the sta-bility of the law, the authority of judicial decisions*, or the *safety of our institutions*. And even when a corporation has violated its charter, it is rather a judicial than a legislative question, whether such violation is a cause of forfeiture." *The State* v. *Granville Alexandrine Society*, 11 Ohio, R. 15. Also in the case of *Michigan State Bank* v. *Hastings*, 1 Douglass, Mich. R. 234, the court say, that if this question was an original one, we should feel bound to give to the arguments of counsel the most deliberate consideration: but if there is any one question more firmly settled than another, it is, that a private corporation, whether civil or eleemosynary, is a contract between the government and the corporators; and the legislature cannot repeal, impair, or alter the rights and privileges conferred by the charter, against the consent and without the default of the corporation, judicially declared and ascertained.

*S. Hempstead* and *L. A. Thomas*, for the bank. These gentlemen argued the case *ore tenus*; as their points and authorities were not submitted in writing, we are unable to give them.

*Opinion by* HASTINGS, C. J. The issue presented by the amended rejoinder of the plaintiff in error, and the demurrer thereto by the defendants in error, raises the question for the adjudication of this court, of the validity of the act of repeal, pleaded in defendant's replication.

By the 23d section of the Act of Incorporation, it is provided—

" That if the said Corporation shall fail to go into operation, or shall abuse or misuse their privileges under this charter, it shall be in the power of the Legislative Assembly of the territory to annul, vacate, and make void this charter."

There was much said in the argument of this case about the character of this institution, as to whether it is a public

or private corporation. The stock being owned by individuals, it cannot be reasonably doubted that it is a private corporation in which the public have no interest or control, except to exercise a supervisory power, and to annul its charter when the franchises granted are misused or abused.

Had the stock been entirely owned by the state, it would have possessed the character of a public corporation.

The plaintiffs in their rejoinder would go behind the act of repeal, and set up matters in avoidance of the act, averring it was passed without the happening of the events which would authorize the legislature to annul and make void the charter.

There appears to be no rule of construction better established in the English books, than that " public grants are construed strictly in favor of the king," and in this country in all conflicts between the sovereign power, and grantees enjoying exclusive privileges conferred upon them by acts of incorporation, the same rule of construction prevails. See *United States* v. *Arrendondo* et al. 6 Pet. Rep. 738. Also, *Charles River Bridge* v. *Warren Bridge*, et al. 11 Pet. 514.

It is argued that the investigation of the facts to be inquired into, and found to exist, as an abuse or misuse of privileges of the corporation, was a judicial act ;—that before the legislature had a right to repeal the act of incorporation, such facts must have been judicially ascertained. It is conceded that without any reservation of the right to repeal, the judicial tribunals would have the power to annul and make void the charter upon ascertaining, by a proper issue, such misuse and abuse.

If, then, it were now necessary to form an issue in the courts and judicially investigate such facts, it would seem absurd in the legislature to have reserved the right thereafter to repeal, when the same end could be accomplished as substantially and more speedily by the court which tried the issue. Such reasoning must lead to the inference that the clause providing for a repeal means nothing.

The more reasonable construction of this clause, it is believed, is, that the legislature, in order to protect the public from the frauds frequently practised by banking institutions at the time when the corporation was created, especially in many of the western states, and also to prevent the mischief of great delay in the territorial courts, [then imperfectly organized in legal proceedings,] reserved to itself the power of inquiring into and finding the facts which the act of incorporation declares shall exist before the right of repeal shall be exercised.

It is urged as a great hardship for this right to be interposed to the detriment, if not destruction of the property of the corporation, which engaged in the enterprise at great expense, and in good faith.

The legislature made a liberal grant of power and privileges to the original grantees, and they accepted of the grant, subject to the limitation and restrictions imposed. It is again urged, that the act of incorporation is a solemn contract, which the legislature, by their act of repeal, have violated.

Follow the strict rules of construction which prevail in questions of grants and contracts between private persons, and it will be seen that the legislature have not violated the conditions upon which the corporation was created. The plain interpretation of the grant is, that the legislature did grant certain powers and privileges to be exclusively exercised and enjoyed, upon a reservation of the power of cancelling the grant and annulling the same whenever such privileges should be misused and abused, the members of the legislature being the judges of the time when, and extent to which such abuse and misuse should be committed. If the corporation have suffered from the undue exercise of such power, they have only to censure themselves for the folly of accepting the grant upon the terms specified.

It is to be presumed that the original grantees believed that no legislative assembly would ever exercise the power of repeal until the contingencies contemplated had happened. Such was the confidence reposed in the good faith which the

legislative assembly is presumed always to exercise towards the rights of the citizens, and it is to be regretted, that the plaintiffs in error should have had their confidence so shaken, as to feel themselves authorized to spread upon the records of a court, facts, if true, which would involve the members of the legislature in the deepest turpitude and corruption. The plaintiffs propose to prove, that when the act of repeal was passed, the bank had never misused or abused its privileges, and did not fail to go into operation. However legitimate it might have been for the plaintiffs in error to prove such facts, before the legislature and its committee, they are now forever estopped by a solemn decision in both branches of the legislative assembly. If we award to the act of repeal the weight and power of a judgment of a court of record, or even of a justice of the peace, it will be readily admitted, that it is not in the power of this or any other tribunal to collaterally question the validity of this act.

In *Voorhees* v. *The U. S. Bank*, 10 Pt. the court say, " If the principle once prevails, that any proceeding of a court of competent jurisdiction can be declared a nullity by any court after a writ of error or appeal is barred by limitation, every county court or justice of the peace in this Union may exercise the same right from which our own judgments or process would not be exempted."

It is true, that from a judgment of inferior judicial tribunals, in some manner an appeal can be taken to a superior within a limited time, but not so from the decision of the supreme judicial power of the land. Their decisions are final, and their judgments import absolute and unquestionable verity ; and so it is with the sovereign legislative power in all their decisions and acts upon " rightful subjects of legislation ;" and that the investigation into the facts upon the ascertainment of which the legislature reserved the right of repeal, is a rightful subject of legislation, is clear from the fact, that the corporators have made it so by their acceptance of the charter with such a right reserved.

In the case of *Crease* v. *Babcock*, 23 Pick. 340, the court

say, " If a default has been committed, then, by the express terms of the compact, they [the legislature] have the right to exercise the power." They have exercised it, and therefore by the courtesy and confidence which is due from one department of the government to another, we are bound to presume that the contingency, upon which the right to exercise it depended, has happened. · Nor is the objection, that the legislature had no power to inquire into the contingency, valid. If any man or body of men is invested with power to do certain acts upon the occurrence of a certain event, when the event happens, they have a right to perform the act. But we do not believe that the inquiry into the affairs of a corporation, with a view to a continuance or discontinuance of it, is a judicial act.

Had the defendants in error traversed the rejoinder, and formed an issue to the jury, the trial would have directly resulted in an investigation into the evidence before the committees and the two houses of the legislative assembly, and if such an investigation should have been permitted, it would follow that the motives of the members would have come under the review of the court and jury ; and if this could be done in this case, the same practice as to other acts of the legislature might prevail ; this would extend the jurisdiction of the courts, from expounding the law as they find it, to decisions of what the law should be, a doctrine repudiated by all enlightened courts, except in cases of clear conflict between the constitution and legislative acts, when it is made the duty of the judicial department of the government to interpose and preserve the integrity of that instrument, which is above the reach of legislative interference.

In the case of *Fletcher* v. *Peck*, 6 Cranch. Rep. (2 Cond. 318,) Chief Justice Marshall, in delivering the opinion of the court, says, " That it may well be doubted how far the validity of the law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, to the formation of a contract by that power, are examinable in a court

of justice.    If the principle be conceded, that an act of the
supreme sovereign power might be declared null by the court,
in consequence of the means which procured it, still there
would be much difficulty in saying to what extent those
means must be applied to produce this effect."

It is argued for the plaintiff in error, that the legislature
have pronounced their own contract rescinded, and annulled
the same; and this is urged as an objection to the validity of
the act of repeal.

However oppressive it may appear for a party to a con-
tract to reserve the right of rescinding the same at pleasure,
or upon the occurrence of events, of the existence of which
he is to be the judge, yet that a party has a right to make
such a reservation, will not be questioned.    The members of
the legislature are the agents of the public, and are presumed
to have no personal interests to serve, other than what per-
tains to their constituents in common with themselves.    They
act in a fiduciary capacity, and are not amenable to the
odium attached to a party who reserves the right of being a
judge in his own case.

The judgment of the district court is affirmed.